

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-25-00179-CR

---

JERMAINE TYRELLE HOOKS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 276th District Court
Titus County, Texas
Trial Court No. CR22570

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Titus County jury convicted Jermaine Tyrelle Hooks of the capital murder of Amelie Griffin, a person under ten years of age.[1]  *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(8) (Supp.).  The trial court imposed a mandatory life sentence without parole.  *See* TEX. PENAL CODE ANN. § 12.31.  Hooks raises two issues on appeal:  (1) there was no evidence to support the jury's verdict as the State failed to provide any evidence that he intentionally or knowingly caused Amelie's death, and (2) the trial court erred in failing to submit a jury instruction on the lesser-included offense of criminally negligent homicide.  Because we find that legally sufficient evidence supports the jury's verdict and the trial court did not err in refusing to submit an instruction on criminally negligent homicide, we affirm the trial court's judgment.

## I.    Sufficiency

In his first issue, Hooks claims that "the evidence at trial was insufficient for the jury to have determined guilt beyond a reasonable doubt."  Specifically, Hooks argues that the State provided no evidence whatsoever that he intentionally or knowingly caused Amelie's death.  The record contains evidence sufficient to support the jury's verdict.

### A.    Standard of Review and Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence."  *Braughton v. State*, 569 S.W.3d 596, 607 (Tex. Crim.

---

[1]We use pseudonyms for the victim and her mother to protect the identity of the minor child.  *See* TEX CONST. art. I, § 30(a)(1) (conferring crime victims with "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX R. APP. P. 9.10(a)(3) (providing that sensitive data, including "a birth date . . . and the name of any person who was a minor at the time the offense was committed" to be redacted from court filings); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982) (using a pseudonym to protect the anonymity of a complainant).

App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010)). "We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson*, 443 U.S. at 319). "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id.* (quoting *Adames*, 353 S.W.3d at 860). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Id.* "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id.* (quoting *Brooks*, 323 S.W.3d 899). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

3

"In reviewing the sufficiency of the evidence, we should look at "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.""" *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Further, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson*, 443 U.S. at 319).

A person commits the offense of capital murder "if the person . . . intentionally or knowingly causes the death of an individual," TEX. PENAL CODE ANN. § 19.02(b)(1), under the age of ten, TEX. PENAL CODE ANN. § 19.03(a)(8). *See Wood v. State*, 560 S.W.3d 162, 164 (Tex. Crim. App. 2018). Hooks does not contest that Amelie was under the age of ten at the time of her death.

"A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a

4

result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b).

"Intent and knowledge are fact questions for the jury and are almost always proven through circumstantial evidence." *Clay v. State*, 390 S.W.3d 1, 8 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)). "The jury may infer the requisite mental state from (1) the acts, words, and conduct of the defendant, (2) the extent of the injuries to the victim, (3) the method used to produce the injuries, and (4) the relative size and strength of the parties." *Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.— Texarkana 2017, pet. ref'd) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck)).

On appeal, we decide the case as it was briefed to us. *See Wolfe v. State*, 509 S.W.3d 325, 345 (Tex. Crim. App. 2017).

**B.      Evidence at Trial**

Kylie Harris, Amelie's mother, testified that she was Hooks's girlfriend at the time Amelie died. On the afternoon of June 29, 2023, Kylie took her newborn son and Amelie, who was almost two years old, to Hooks's home. When they arrived, Amelie was acting normally and was healthy, happy, and playful. Amelie spent some time playing outside with a baby doll.

Kylie said she did not want Amelie to go to sleep at Hooks's home; she wanted to keep Amelie awake until they left. It was getting dark outside, and Hooks asked to take Amelie for a walk to help keep her awake. Hooks and Amelie went for a walk, and when they returned, Hooks was carrying Amelie. Kylie said that after that, "[her] baby was never up again."

5

Kylie said Hooks first told her that Amelie had fallen asleep. Kylie said she did not know how serious it was because Hooks told her that Amelie had fallen asleep. But Hooks later told Kylie that Amelie had fallen and bumped her head.

Kylie stated that they took Amelie inside and laid her down. They later decided to take Amelie to the hospital because "she didn't seem like she was responding," "[s]he had a knot on her head," and she was making sounds Kylie had not heard before. Hooks and Kylie took Amelie to the emergency room at Titus Regional Medical Center. Kylie told hospital staff what Hooks had told her—that Amelie had bumped her head. Kylie also told them that Amelie was not breathing regularly. After sitting in the waiting room for a while, Hooks went back to the reception desk to ask for help again. After Amelie was assessed, she was transferred to Children's Medical Center Dallas (Children's), where she died.

While Amelie was at Children's, Kylie stated that Amelie's father showed up, angry. She testified he said "that he was going to shoot the hospital up," which made the nurses and Kylie uncomfortable. Kylie testified that, because she was afraid of Amelie's father, she initially told the police that she was with Amelie when Amelie fell.

Salvador Montes, who lived one street over from Hooks, testified that his home-security cameras captured video recordings of Hooks walking with Amelie. Montes testified about several short video recordings, shown to the jury, which show Hooks and Amelie walking back and forth along the side of the road in front of his house on June 29, 2023, between 9:00 p.m. and 10:00 p.m. No passing cars appeared in the video recordings.

Marquin Brewer, a detective with the Mount Pleasant Police Department, testified that he reviewed video recordings from Titus Regional Medical Center. The video recordings show Kylie carrying Amelie, who was not breathing, into the emergency room waiting area. Hooks was sitting beside Kylie, looking at her "every once in a while" and then "go[ing] back to being on his phone." Hooks stood up at one point to let the receptionist know that Amelie was not breathing.

Brewer stated that he interviewed Kylie and Hooks, noting that Hooks voluntarily presented himself for the interview. During the interview, Hooks initially said he and Kylie were walking together with Amelie. Brewer challenged Hooks on his story, and Hooks admitted that he was alone with Amelie during their walk. During the interview, Hooks maintained his position that Amelie fell and hit the front of her head.

Dr. Kristen Nicole Reeder, a child-abuse pediatrician with the REACH[2] Clinic at Children's, testified that she "perform[s] medical evaluations [on] children who are suspected to be victims of abuse or neglect," and she participated in Amelie's evaluation. Reeder's team formed an assessment of Amelie based on her medical record, information from their own evaluation, interviews with the caregivers, and Amelie's laboratory work or imaging. Reeder's team was given a history that Amelie was injured by a "blow to the head from a fall," and while the team determined that Amelie's "injuries were due to trauma," the team "couldn't differentiate . . . between whether it was deliberate abusive trauma or accidental trauma." Reeder testified

---

[2]REACH "stands for the Referral and Evaluation of At-Risk Children, and it is the child-abuse or child-maltreatment program at Children's."

7

that her assessment was based on information through July 3, yet she stated that even as of the day of her trial testimony, she still could not rule out an accidental cause of Amelie's injuries.

Reeder was asked whether her opinion would change if the history were different—specifically, if only Hooks had been present, and not Kylie, when Amelie's injuries took place. Reeder stated that her opinion would not change based on who was with Amelie, but "a changing history, in general, [wa]s concerning to [her], as a child-abuse pediatrician."

Reeder clarified that Amelie's injury to the back of her head was not identified in any of her exams in the hospital and was not discovered until the medical examiner performed Amelie's autopsy.

Dr. Travis Danielsen, a medical examiner with the Southwest Institute of Forensic Sciences, testified that he performed an autopsy on Amelie. Danielsen described Amelie's external injuries as "an area of swelling on the left side of the forehead and some scab-type lesions or abrasions or scrapes in that area." Those were the only external signs of trauma. Danielsen said that Amelie also had bleeding under her scalp at the left front of her forehead and a larger area of bleeding also under her scalp on the left back side of her head. Danielsen stated that those injuries were evidence of trauma in the form of one blow to the front of the head and one blow to the back. There was subdural hemorrhage, or bleeding under the thick layer of tissue below the skull that covers the brain, over the right side of Amelie's brain, the left side, and at the base of her brain. There was also subarachnoid hemorrhage, bleeding under the thin, transparent layer of tissue that sits right on top of the brain. Amelie's brain was swollen. Danielsen concluded from these observations that there was "a significant amount of trauma to

8

result in bleeding around the brain to that degree." "[T]here was enough blood that it was shifting [Amelie's] brain, shifting one side of the brain towards the other." A number of photographs of Amelie's injuries were admitted into evidence, as was Danielsen's report.

Danielsen testified that he would not expect these types of injuries from a fall. He said that "a significant amount of literature" supports a conclusion that "falls from a standing height in a child or a toddler . . . can result in superficial injuries, scrapes, bruises, lacerations" and even "linear skull fractures." "But these types of everyday childhood occurrences do not result in the subdural and subarachnoid hemorrhage to the degree we see here." Danielsen concluded that Amelie's "blunt force injuries [were] the cause of death, and the manner of death [was] homicide."

Danielsen was questioned whether Amelie could have sustained these types of injuries from a fall. He stated that Amelie's injuries "would almost certainly result in unconsciousness" or "immediate altered mental status." Danielsen said that if Amelie had fallen and sustained either one of these blows, to the front or back of her head, she probably would not have been able to walk on her own. Danielsen concluded that if a child of Amelie's age fell forward and sustained that type of injury, it would have been very unlikely, due to the degree of trauma to the brain, that she could get up on her own and fall again, backwards.

Chris Durant, a detective with the Mount Pleasant Police Department, testified that he met with Hooks in order to review the path of the walk Hooks took with Amelie. The meeting was recorded on Durant's body camera. Durant stated that Hooks walked him to an area where

9

Hooks said Amelie fell and described the path of their walk. Hooks said that Amelie fell on their way back to his house.[3] Durant's body-camera recording was shown to the jury.

Durant testified that there were no potholes or rocks that Amelie would have tripped on, but he acknowledged that she could have tripped on flat pavement. Durant also acknowledged that there was a drain with concrete buildup approximately twenty to twenty-five feet away from the area where Hooks said that Amelie fell and that the area was dimly lit. Durant further testified that Hooks did not mention that Amelie tripped on anything, and instead, Hooks said he did not see anything that she tripped on.

## C. Legally Sufficient Evidence Supports the Jury's Verdict

As stated above, Hooks contends that there was no evidence to support the jury's determination that he intentionally or knowingly caused Amelie's death.

The testimony at trial established that Amelie's injuries were traumatic ones. Kylie testified that after Hooks returned from his walk with Amelie, he was carrying her, and Amelie was never responsive again. Instead, Amelie's breathing became abnormal, and she developed a knot on her head. Amelie was seen at Titus Regional Medical Center but was soon transferred to Children's, where she died.

Although Reeder testified that she could not differentiate Amelie's injuries as being the result of a fall or of intentional abuse, Danielsen, who performed Amelie's autopsy, testified that the blows to the front and back of Amelie's head were more severe than injuries from a fall from the standing height of a toddler. Danielsen said either injury would have left Amelie unable to

---

[3]The location where Hooks said Amelie fell was between Montes's home and Hooks's home.

10

walk. Either injury would have made it very unlikely that she could get up and fall again. Danielsen said Amelie's injuries caused so much bleeding in her brain that it caused her brain to shift.

In addition, although Hooks never denied being with Amelie when her injuries took place, he changed his story multiple times. Kylie said Hooks initially told her that Amelie fell asleep, but he later said she fell and bumped her head. Brewer also testified that Hooks changed his story—first saying that he and Kylie had both gone on a walk with Amelie, but when challenged, Hooks admitted that it was only he who walked with Amelie. Reeder testified that a changing history concerned her, as a child-abuse specialist. Conduct in which a defendant attempts to hide his culpability may be viewed as "consciousness of guilt and an attempt to cover up the crime." *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

The medical evidence shows that Amelie died as a result of blunt-force trauma to her head. According to testimony regarding Hooks's own statements to others, Amelie's injuries occurred while Hooks was alone with her. On that evidence, the jury was free to reasonably infer that Hooks intentionally or knowingly caused Amelie's death. *See Rhymes*, 536 S.W.3d at 95. Moreover, "[w]hen an adult defendant has sole access to a child at the time the child sustains the injuries, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Cuadros-Fernandez v. State*, 316 S.W.3d 645, 654 (Tex. App.—Dallas 2009, no pet.) (citing *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd)).

11

Viewing all the evidence in the light most favorable to the verdict, the jury could have found the essential elements of the offense beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609 (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)).

We overrule Hooks's first issue.

## II.    Charge Error

In his second issue, Hooks urges error in the trial court's refusal to instruct the jury on the lesser-included crime of criminally negligent homicide.

After the parties rested, the trial court considered Hooks's objection to the proposed jury charge and his requested jury instruction on the lesser-included offense of criminally negligent homicide. The State objected to Hooks's requested instruction on the basis that there was no evidence to raise the issue, and the trial court refused to include the lesser-included offense instruction in the jury charge.

### A.    Standard of Review and Applicable Law

We review a claim of error in a jury charge in two steps. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). "First, we determine whether the charge is erroneous. If it is, then we must decide whether the appellant was harmed by the erroneous charge." *Id.* (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013)). "If a defendant timely objects to alleged jury-charge error, the record need only show 'some harm' to obtain relief." *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 2013) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988)).

12

If a defendant does not timely object, "the record must show 'egregious harm'" to obtain relief. *Id.* (quoting *Almanza*, 686 S.W.3d at 171).

"Whether a defendant [was] entitled to a [lesser-included offense] instruction turns on a two-part test." *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). "First, we compare the statutory elements of the alleged lesser offense with the statutory elements of the greater offense and any descriptive averments in the indictment." *Id.* (citing *Safian v. State*, 543 S.W.3d 216, 220 (Tex. Crim. App. 2018)). "If proof of the lesser offense is included within proof of the greater offense, the first step has been satisfied." *Id.* (citing *Safian*, 543 S.W.3d at 220; TEX. CODE CRIM. PROC. ANN. art. 37.09(1)).

The Texas Court of Criminal Appeals has "explicitly stated that the first prong is a matter-of-law determination, and, therefore, *de novo* review is appropriate."[4] *Goad*, 354 S.W.3d at 451 (Alcala, J., concurring) (citing *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007)); *see State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013) ("The first step of the analysis is a question of law . . . ."). The Texas Court of Criminal Appeals has recognized criminally negligent homicide as a lesser-included offense of capital murder, *Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex. Crim. App. 2000), and the parties do not contest that determination.

The second prong of a defendant's entitlement to a lesser-included offense instruction is a showing of "evidence from which a rational jury could find the defendant guilty of only the lesser offense." *Chavez*, 666 S.W.3d at 776. "[T]he guilty-only requirement is met if there is

_____

[4]"The standard of review applicable to lesser-included-offense instructions depends on which of the two substantive prongs the court is reviewing." *Goad v. State*, 354 S.W.3d 443, 451 (Tex. Crim. App. 2011) (Alcala, J., concurring).

affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense." *Id.* (citing *Roy v. State*, 509 S.W.3d 315, 319 (Tex. Crim. App. 2017)). "It does not matter if the factual dispute is based on direct or circumstantial evidence so long as a rational jury could interpret the record in a way in which it could find the defendant guilty of only the lesser-included offense." *Id.*

"We consider all the evidence admitted at trial." *Id.* at 776–77 (citing *Goad*, 354 S.W.3d at 448). "Even a scintilla of evidence is sufficient, no matter how controverted or incredible." *Id.* at 777. "But the evidence must be directly germane to the [lesser-included offense] and present the [lesser-included offense] as a valid, rational alternative to the greater offense." *Id.* "[I]f the defendant presents evidence that he committed no offense at all . . . or if he presents no evidence . . . , and there is no evidence otherwise raising the issue, a charge on [a] lesser offense . . . is not required." *Id.* (alterations in original) (quoting *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985)).

The standard of review on the second prong is abuse of discretion. *See Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005) ("[T]he trial judge . . . has the discretion to determine whether the evidence supports a lesser-included offense instruction."); *Brock v. State*, 295 S.W.3d 45, 49 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("We review the trial court's decision regarding a lesser-included offense in the jury charge for an abuse of discretion."); *Barrios v. State*, 389 S.W.3d 382, 393 (Tex. App.—Texarkana 2012, pet. ref'd) (same); *see also Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004) (applying an

abuse of discretion standard of review on the determination whether to include a charge on a lesser-included offense).

"When a trial court improperly refuses a properly requested instruction on a lesser-included offense, such that the jury's only option is to convict or acquit on the main charge, a finding of harm is automatic, because the jury was denied the opportunity to convict the defendant of the lesser offense." *Brock*, 295 S.W.3d at 49 (citation omitted).

### B. The Trial Court Did Not Err in Refusing to Submit Hooks's Requested Instruction

The parties do not contest that criminally negligent homicide is a lesser-included offense of capital murder. Thus, we need not further address the first step in determining whether Hooks was entitled to an instruction on the lesser-included offense. "The only question, then, is whether there is some evidence in the record that would permit a jury to rationally find [Hooks] guilty only of . . . criminally negligent homicide." *Delacruz v. State*, No. AP-77,079, 2023 WL 2290863, at *5 (Tex. Crim. App. Mar. 1, 2023) (not designated for publication).[5]

"A person commits [criminally negligent homicide] if he causes the death of an individual by criminal negligence." TEX. PENAL CODE ANN. § 19.05(a). "A person acts with criminal negligence . . . with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX. PENAL CODE ANN. § 6.03(d). "The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of

---

[5]"Although unpublished cases have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes*, 536 S.W.3d at 99 n.9 (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2023, pet. ref'd)).

care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "[A defendant is] entitled to an instruction if there was some evidence in the record to permit a jury to rationally find that [he] engaged in conduct that caused [the victim's] death . . . while he ought to have been aware of a [substantial and unjustifiable] risk . . . ." *Delacruz*, 2023 WL 2290863, at *6.

When Hooks presented his requested instruction on criminally negligent homicide, the trial court questioned him as to what evidence was presented that supported his request. Hooks's counsel responded,

> The circumstances of the case, that he's out in the dark at night on the street with a sleepy child, walking down the street, and . . . he's looking at his phone or has his cell phone . . . he did not adequately supervise the child . . . under the circumstances of the walk, the dark, the pavement, and so forth, . . . but the omission of not caring for the child adequately and [sic] resulted in the injury and the injury resulted in [Amelie's] death. But he didn't cause [her] death. If anything, at most, he's done, it was just that he did not properly supervise the child on the walk.

On appeal, Hooks points to evidence of "improper supervision"; "failure . . . to perceive the risk to walking with a young child alone at night"; Amelie being in "improper footwear for a walk"; taking her for a walk "at night," when she "was tired from having been up all day and her mother was expressly trying to keep her from falling asleep"; the fact that Amelie "was a newly mobile toddler[,] and . . . small children can be unsteady on their feet"; the "dimly lit" street "with no street lamps"; and the "drain which created an uneven surface on the road." Hooks stresses that the evidence "tended to show that the injuries resulted from an accident."

Hooks's argument that the evidence tends to show that Amelie's injuries were the result of an accident misperceives the elements of criminally negligent homicide and instead treats

16

criminal negligence as if it were equivalent to civil negligence. But the Texas Court of Criminal Appeals "has acknowledged that, under the law, criminal negligence is different from ordinary civil negligence." *Queeman v. State*, 520 S.W.3d 616, 623 (Tex. Crim. App. 2017) (citing *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012)). "The carelessness required for criminal negligence is significantly higher than that for civil negligence; the seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193). "The risk must be 'substantial and unjustifiable,' and the failure to perceive it must be a 'gross deviation' from reasonable care as judged by general societal standards by ordinary people." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193). "Whether a defendant's conduct involves 'an extreme degree of risk' must be determined by the conduct itself and not by the resultant harm." *Id.* (quoting *Williams v. State*, 235 S.W.3d 742, 753 (Tex. Crim. App. 2007)).

Neither the circumstances of Hooks's walk with Amelie, taken piecemeal or altogether, nor medical testimony that Amelie's injuries could have resulted from an accidental fall, presents a substantial and unjustifiable risk that a toddler walking with an adult, alongside a road at night, would fall and suffer blunt-force trauma on both the front and back of her head sufficient to end her life. *See Delacruz*, 2023 WL 2290863, at *6. The evidence presented at trial did not present a valid, rational alternative to the charged offense of capital murder. *See Chavez*, 666 S.W.3d at 776. The trial court did not abuse its discretion in denying Hooks's requested instruction on the lesser-included offense of criminally negligent homicide.

We overrule Hooks's second issue.

17

## III.    Conclusion

We affirm the trial court's judgment.


                                            Jeff Rambin
                                            Justice


Date Submitted:     May 18, 2026
Date Decided:       July 1, 2026

Do Not Publish

18